THE ILLINOIS TRUST & SAVINGS BANK, *as Trustee, etc.*, V. THE CITY OF BURLINGTON.

No. 15,921. (101 Pac. 649.)

SYLLABUS BY THE COURT.

1. ELECTIONS—*Extension of Water-mains—Vote Required.* A provision in a city ordinance that a water-works company shall extend the water-mains "when requested to do so by a majority of all votes cast at any general or special election at which the proposition of such extension shall have been submitted to the people" means that the company is not required to make an extension unless a majority of all those voting on any proposition at such election vote in favor of the extension.

2. CONTRACTS—*Modification—Authority of Agent of a Corporation.* The power to make agreements modifying the franchise and contract made between the water-works company and the city is not incidental to the office of secretary of the company or of superintendent of the water-plant, and an agreement of that kind, if made by such officer, is not binding on the company in the absence of evidence of authority to make it or of ratification by the company.

3. ——— *Forfeiture—Estoppel—Contract Executed by a Re-*

*ceiver for One Party.* The water-works company shut down the plant on the alleged ground that the earnings were insufficient to meet operating expenses, and a receiver for the company was appointed, with the consent of the city, who proceeded to operate the plant and to supply water to the city. *Held,* that the receiver was in a sense a trustee for the city and the company, and the city was not in a position to insist on a forfeiture for the non-supply of water while it was receiving water from the receiver, nor to claim damages from the company as if no water had been furnished.

4. DAMAGES—*Liquidated.* Where damages provided for in a contract are uncertain in their nature and can not well be ascertained by any pecuniary standard, and where the parties themselves, understanding the peculiar circumstances surrounding the transaction, are better able to estimate the loss that may be sustained by delay or failure of performance, they are permitted to fix the amount of damages to be recovered.

5. —— *Same.* A provision in the contract stipulating that if the water-works company shall be temporarily unable to supply water no rentals shall be paid during such period, and that if the disability be the fault of the company the rebate for water rent shall be for double the time the works are thus disabled, should be regarded as liquidated damages recoverable by the city.

Error from Coffey district court; FREDERICK A. MECKEL, judge. Opinion filed April 10, 1909. Reversed.

*T. F. Garver,* and *R. D. Garver,* for plaintiff in error.
*E. J. Crego,* and *E. N. Connal,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: This is an action brought by the Illinois Trust & Savings Bank, as trustee for certain holders of bonds issued by the Burlington Water Works Company, for rentals due to the company from the city on hydrants used for fire protection to the city. In March, 1897, under an ordinance duly passed, a contract was entered into by the city of Burlington, the Burlington Water Works Company, and the Illinois Trust & Savings Bank, which granted the right and privilege to the company of furnishing water to the city

and its inhabitants for twenty years, and by which the city was to pay $1750 per year for fire protection; and it was further stipulated that the hydrant rentals should be paid to the Illinois Trust & Savings Bank. Under the contract the company furnished water to its patrons until September 24, 1904, and at that time, if not excused from payment by any default of the company, there was due from the city as hydrant rentals the sum of $1243.71. To recover that amount from the city this action was brought, but the city denied liability because of alleged defaults on the part of the company which it is alleged operated as a forfeiture of the rentals claimed.

In the ordinance was a provision that the company should extend its mains to any part of the city when requested to do so by a majority of all the votes cast at any election at which the proposition was submitted to the people, and it was further provided that for every 430 feet of the mains so extended the city should rent one or more hydrants at an annual rental of $35. On April 7, 1903, an election was held and a proposition to extend the mains was submitted to the voters, at which election 191 votes were cast, the vote on the water-works extension being 82 votes in favor of, and 80 against, the extension. The mayor, in August, 1903, assuming that the proposition was carried, served formal notice on the company that the proposition to extend the mains had been adopted. An ordinance was passed on April 15, 1904, which provided for the payment of the stipulated rental of $35 per hydrant for every 430 feet of extended mains.

About July 26, 1904, the company gave notice to the city and its patrons that because the entire receipts of the business were insufficient to pay operating expenses, taxes and interest it would be obliged to shut down the plant. In accordance with this notice, and on September 24, 1904, the company discontinued furnishing water to its patrons because of inability to pay op-

erating expenses. On November 1, 1904, upon applica-
tion of the Illinois Trust & Savings Bank, and with the
consent and upon the suggestion of the city, the federal
court appointed S. D. Weaver as receiver to take charge
of the water-works plant, and thereafter he operated
the plant and furnished water to the city at the monthly
rate of $175, as well as to private consumers, until the
plant was sold. The mortgage on the plant given to the
Illinois Trust & Savings Bank was foreclosed in the
federal court, and the plant was sold at foreclosure sale
on June 25, 1905. Shortly afterward the company as-
signed its claim to the unpaid hydrant rentals which
had accrued from January to September of the year
1904 to the Illinois Trust & Savings Bank. This claim
was not involved in, nor adjusted by, the proceedings
in the federal court. When the bank presented the
claim to the city it refused payment, claiming that by
the defaults of the company all right to the rentals had
been forfeited. In this action to recover the rentals the
district court gave judgment for the city, holding that
the defaults of the company operated as a forfeiture of
its claim for rentals, and from this judgment the plain-
tiff prosecutes this proceeding in error.

It appears that the city was indebted for the amount
claimed as hydrant rentals unless the failure of the
company to fulfil its obligations to the city excused pay-
ment. On the side of the city it is claimed that it was
the duty of the company to extend its mains in ac-
cordance with the result of the election and the subse-
quent direction of the mayor and council. It seems that
the election did not result in favor of the extension of
the mains. While there were more votes cast for the
proposition than against it, a majority of the votes cast
at the election were not in favor of the proposition.
The ordinance which controls provided that the com-
pany should extend the mains "when requested to do so
by a majority of all votes cast at any general or special
election at which the proposition of such extension shall

have been submitted to the people." To carry the proposition it was not enough that more votes were cast for the proposition than were cast against it, but it was necessary that there should be a majority of all the votes cast at the election on any question in favor of the proposition, and as has been determined "the names of the voters appearing on the poll-books furnish the best evidence of the number of votes cast." (*High School v. Commissioners,* 61 Kan. 796, syllabus, 60 Pac. 1057. See, also, *In re Davis,* 62 Kan. 231, 61 Pac. 809; *Humboldt v. Klein, ante,* p. 209.)

If all of the 191 votes cast were legal 96 affirmative votes were necessary to carry the proposition. Much is said as to whether women were qualified to vote on the question, but the findings disclose that even if women should not be regarded as some of "the people" to whom the question was to be submitted, and if the women voters are entirely eliminated from consideration, the proposition failed. It was found that of the 191 names of persons appearing on the poll-books at least 15 were women. In one ward 5 women voted for the proposition, but how the other women voted does not appear. Assuming that the women were disqualified, and deducting 15 (the number of women who voted) from the total number of votes cast, we have 176, and a majority of these would be 89, which is 7 more than were cast for the extension. In any view that may be taken of the right of women to vote on the question there was not the majority which the ordinance required. The election therefore imposed no obligation upon the company to extend the mains, nor can its failure to observe a request of the mayor based on that election be regarded as a default or a ground of forfeiture.

Another defense of the city is that the company did not raise any objection to the regularity of the election and that the company made no other objection than that the city had not passed an ordinance providing for the payment of the rentals on the proposed extension.

51—79 KAN.

The court found that the company proposed to the city and promised that if the city would pass an ordinance providing for the payment of the hydrant rentals on the extension the company would undertake to build them. There was a further finding that the ordinance was subsequently passed by the city, but that the company refused to make the extension, and never in fact intended to comply with the agreement. The testimony in the abstract does not sustain the finding of an agrement by the company to extend the mains if an ordinance were passed. Some statements of Weaver, who was secretary and superintendent of the plant, were made to the effect that if the council would pass an ordinance the company would extend the mains, but there is an absence of evidence to show that he was authorized to speak for or bind the company by an agreement of that kind. Several of the letters written by Gwinn, the non-resident president of the company, were put in evidence, but they failed to show authority in Weaver to make the agreement, and Weaver himself testified that he had no such authority from the company or any of its officers. The power to make agreements of this character ordinarily resides in the governing body, the board of directors, and it does not appear that the board ever took any action as to the proposed extension. It would seem that to assume an obligation of this kind some action of the board should be taken, and there is good ground to question whether the making of such agreement is incidental to the powers exercised by the president of the company. Assuming, however, that the president, by virtue of his office, had the power to act for the company in this important matter, we find no expression of his which warrants the inference that power was conferred on Weaver to make the agreement or that the president himself had undertaken to bind the company to make the extension. Indeed his letters manifest a purpose to avoid any assumption of such an obligation. In his letter to the city attorney, printed

in the counter-abstract, he said that he had written to the superintendent, Weaver, in regard to the making of the extension, but he couples with it the specific statement that he had referred the matter to Weaver "for further information." His correspondence, although not always frank, indicates that he did not intend to undertake the extension of the mains nor say anything which would bind him or the company to do so. Anything said falls far short of an agreement conferring authority on Weaver or of an agreement binding the company to extend the mains in case an ordinance was enacted by the city.

There is a further contention by the city that if the rentals were earned they were forfeited by the shutting down of the plant on September 24, 1904, and the failure of the company itself to supply water from that date to June 25, 1905, when the plant was sold under a decree of the federal court. In section 12 of the ordinance it was provided that the company should not shut off the supply of water from the city or its inhabitants except for repairs and extensions, and then not to exceed ten hours at any one time, and that "if from any cause the said water-works company be temporarily unable to supply water to the city or individual consumers, all rents for use of water shall cease during such periods, and if such disability be the fault of said water-works company, its successors or assigns, the rebate for water rent shall be for double the time the works are thus disabled." In section 16 of the ordinance it was provided that if the company, its successors or assigns should "fail to perform any of the duties or to keep any of the covenants herein made and entered into in which penalty is not otherwise provided for, said water-works company shall forfeit all hydrant rentals from notice until such failure is removed." Under the provision of section 12 of the ordinance the company could not, of course, claim rentals from the city or from private consumers from September 24, 1904, until November 1 of the same year, for

during that period no water was supplied to any one. It appears, however, that no claim was made for rentals during that period, nor while the plant was operated by the receiver. It is claimed by the city that it is entitled to recoup from the company and the plaintiff for the period during which the receiver operated the plant and furnished water to the city and individual consumers. While the company itself did not directly furnish the water, it was furnished by the receiver, who was acting for the company in that behalf. The receiver was not only a representative of the court but he was in a sense a trustee for the company and the city in the operation of the plant. (*McDonald v. Carney*, 8 Kan. 20; *Rouse v. Harry*, 55 Kan. 589, 40 Pac. 1007.) In the execution of the contract between the city and the company he acted for both, and manifestly with the consent of both. The city is not in a position to insist on a forfeiture for the non-supply of water while it was receiving water under the contract from the receiver acting in its behalf. There may be ground for a claim of damages for the rental paid to the receiver in excess of that which the city was required to pay under the ordinance, but there is no right to claim damages as if no water whatever had been furnished.

Whether the city may recoup for the thirty-eight days when no water was supplied depends upon whether the failure to supply water was the fault of the company. Notice was given by the company and the claim made that it was unable to furnish water because the receipts from the business were insufficient to pay the necessary expenses of operation. In behalf of the plaintiff it is urged that if the city had paid the rentals when they became due the company would not have been obliged to shut down the plant. The claim is that the lack of funds and the consequent shutting down of the plant were due to the fault of the city rather than the fault of the company. It is possible that the company might not have been compelled to shut down until a later time if the city had paid the rentals that were

due. It appears, however, that the officers were insisting that the company could not earn enough under the franchise to keep the plant in operation. They did not suspend operations because this debt was not paid, and it can not therefore be said from the testimony that the suspension of operations was due to the failure of the city. If the failure to supply water for the thirty-eight days was the fault of the company, the city was entitled to a counter-claim against the plaintiff of twice the amount which would have been earned as rentals for the period when the plant was not operated. The plaintiff, however, contends that the enforcement of this penalty of the contract would operate unjustly, and that the plaintiff should not lose more than the actual damages sustained. The court rightly held, however, that this provision should be treated as liquidated damages. The parties evidently recognized the difficulty of ascertaining the loss which might result from the failure of the company to carry out this provision of the contract, and so they stipulated in advance the amount of damages to be paid. Where damages provided for are uncertain in their nature and can not well be ascertained by any pecuniary standard, and where the parties themselves, understanding the peculiar circumstances, are better able to measure the loss that may be sustained, they are allowed to fix the amount of recovery. (*St. L. & S. F. Rly. Co. v. Shoemaker,* 27 Kan. 677; 13 Cyc. 97.) It can not be said that the amount fixed in this instance is so disproportionate to the actual loss as to be unreasonable, and looking at the contract in its entirety, and including the obvious intention of the parties, the stipulation should be regarded as liquidated damages.

As there are important findings, however, that are not sustained by the evidence, we can not direct the judgment to be entered, and hence the judgment rendered is reversed and the cause remanded for a new trial.